The next case on our calendar is Allen and Haar v. Stephen Taylor. I need more water. Thanks. Good morning, and may it please the Court. I'm Daniel Smith, and I represent the appellant intervenors and the appellants. I reserve two minutes for rebuttal. Yes, you have. The controlling factor in this case, Your Honors, is that the district court, in making the fee award allocation in this case, did so after it had twice rejected the proposed settlement that had been reached and joined Intervenor Council for the express purpose of, I'm sorry, excuse me, Intervenor Council were joined for the express purpose of remedying the stagnation in the settlement process that had occurred in this case. That's the controlling factor. By the Court's own terms, a stagnation had occurred that had resulted in, as I said before, the Court twice rejecting a proposed settlement, notwithstanding that the settlement included a $50 million common fund. And in addition, the stagnation also included a communications breakdown between the lead counsel and the named representative that extended all the way to the named representatives attempting to remove the lead counsel. At that point, the Court joined Intervenor Council, directed them to give the settlement process one more attempt with a 90-day window, a very short window. The issue that the Court was asked to consider in making the fee allocation in this case was the contributions that Intervenor Council had made in that intervening short window of 90 days. The Court directed lead and Intervenor Council to attempt to work out an understanding of what that allocation was supposed to be. Roberts. Why do you think the judge didn't take that into account? So the judge talks about the contributions they make because of expertise in the industry. She explicitly gives them compensation for their participation in the settlement negotiation process. So why do you think the district court failed to take that into consideration? It's not that we don't — that we think the district court failed to take it into account. The district court — excuse me — failed to take it into account under the proper legal standard, which was the question of the contribution to the settlement that had been rejected. What — where your question leads, Your Honor, is that what the — notwithstanding the fact that the issue presented was the contributions, the district court made a post-settlement fee, allocated a post — thank you, Jonathan — imposed a post-settlement fee allocation and looked at the case going backwards instead of going forward. The — what was briefed to the Court was a rejection of the settlement. I mean, when it talks about the intervener counsel's — it says intervener counsel's attorney's fees award is the headline of that discussion. And then for the subclass counsel, it says subclass counsel's supplemental fee award. So it does seem like she's talking about the fees you're talking about in terms of attorney's fees as distinguished from a supplemental fee. So why are you convinced that she's thinking about it in terms of a supplemental fee — as a supplemental fee? And why would that make a difference? Well, I think your question — the inference in your question, the question of just seems to be that this Court's case law is really, really quite comprehensive in two ways. It defines abuse of discretion, number one, as a matter of deference to the trial court. On the other hand, it provides very specific guidelines when fee allocations are to be made within which the discretion is to be applied. In the fee — in the overall fee award that was made to all attorneys, which included intervener counsel, of $7 million, the Court went through a comprehensive Goldberger analysis and did some measure of a — of a lodestar crosscheck. It's very difficult to find that in this case, Your Honor. And as a result — But that — those Goldberger factors are about making the overall fee award, right? That's what that test is supposed to do. Allocation is a somewhat different issue, isn't it? Good question, Your Honor. And again, I think the — there's two problems in the Court's decision. Number one, you can't really tell what legal principle had been applied. It relies on OLEC, sets it up as a post-settlement fee award, and then at the same time — No, that's just — I mean, I think that's just mistaken. Yes, the judge talks about that at the very beginning and says general things about the supplemental award because that's part of what she's doing. But it's quite clear to me that when she gets to the point of looking at your fees and what they should be, she's talking about what contribution was made to the overall case. That's not the language of a supplemental award. She's looking at the lodestar amounts and what of that she's going to discount and what she's not going to discount. That's not about — that's not a factor that only is relevant to a supplemental award. That's about assessing what the contributions are and what's an appropriate payment for it. That's what she's doing. Now, maybe she didn't do it right or maybe you don't like the result or whatever, but I think it's just specious to say that somehow the judge thought that what she was doing was giving you a supplemental award or using the standards that apply only to supplemental awards. With respect, Your Honor, the conclusion of the court's award is Intervenor counsel are entitled to be compensated for their time incurred in the Har Appeal post-settlement, monitoring the claims administration process post-settlement, and their participation in the settlement negotiation process. Yes. What is the settlement negotiation process, Your Honor? There was no settlement at the time Intervenor counsel was joined. And then you participated in the settlement negotiation process that resulted in the final settlement, and that's what you're being compensated for. So what do you — I don't get the complaint about that piece of the statement. She says you were participating in the settlement negotiation process, not you were participating in redoing a settlement or something. You participated in the settlement negotiation process. That's what you say you did. As we said in our brief, and with respect, it's not that we discount that that was taken into account. However, what was presented to the court was that issue. The post-settlement issue was not presented to the trial court. There was no hearing on that issue, no consideration in the briefs at all. The court went off in that direction on its own. If the court wanted to— But you're saying she should have given you less because she took into account what you did with respect to the appeal and she shouldn't have? Fair question, Your Honor. We're taking the risk that if the case is remanded, that could be what's happening.  But isn't that what your argument is, is that she's looking at the – she shouldn't have been looking to that? That shouldn't have been factored in at all to how much you ultimately billed for and what percentage of what you billed for you should have gotten. That's what she's saying. No, Your Honor. With respect, what we're saying is that on that point, which was the controlling issue in what had been presented to the court, that the court should have made at least some findings under Goldberger, at least assessed the matters at issue with some degree of specificity, because that was the issue. That was the— You have the failure of your attorneys to submit the billing records and all of the other material that's required. So how could she have done the detailed findings if she didn't get that from the attorneys? Yes, Your Honor. I just have to suggest that the Court seems to have not considered our first submission which had been presented in the proceedings that involved the establishment of the overall fee award. We made a submission that explained in much more detail than just the simple Lodestar statement. Again, no findings. No reference to that part of the case. There's only a reference to the submission on the post-settlement award, post-settlement factors, which was presented for our Lodestar cross-check. Additional time. The Court references 850-odd hours. That was the addition. What the judge was taking account of was the fact that this was a litigation that proceeded for years, got to the point of something that was very close to a settlement that the lead plaintiffs and others objected to, and therefore you folks came in and did a terrific job of closing that gap. But when you look at the entire spectrum of what the efforts were, you were doing a discrete project of negotiating that final settlement, very valuable, and then we look at what is that worth in the grand scheme of things out of a total appropriate award of $7 million. Isn't that and is it inappropriate? The way I just phrased it, if that's what the district judge was doing, is that inappropriate? It's not inappropriate. It's a good, succinct summary. But what's missing is that the body of the hours that we employed in the case, the body of the hours, over 800 hours as compared to 1,100 with the post-settlement, the body of those hours essentially got discounted without any real explanation. And Goldberger is available. And all the other, you know, if you look at what the attorneys who were fighting this case for years, that the haircut that they took on their Lodestar amount is yours greater proportionately than theirs? Absolutely fair point, Your Honor. Where's the finding on it? If that had been the court's. I'm asking you, as a matter of fact, if we send this back, are you going to be able to establish that you took a bigger haircut than they did? Well, but the issue is, is that Lodestar measurement, is that the appropriate valuation that should have been applied? Our suggestion is the abuse of discretion is in failing to identify which was the doing what you did, which is succinctly stating a summary without any explanation of that. Counsel, your time has expired. It looks like the next person to argue is Jonathan Haar, who is pro se for five minutes. Thank you, Your Honor. Your Honor, I recognize that this is a quite unusual circumstance we find ourselves in. We're here arguing that there's no benefit to the class, and much more seriously, no benefit to society at all. The attorneys can request relief or something from a settlement fund on the assumption that they provided a benefit to the class. Us, personally, the defendants forced the sale of our dairy on January 8th of this year. As for the class at large, according to the Federal Milk Marketing Administrator, we've lost 813 dairy farms this year in this order. That's the largest year-to-year decrease ever recorded. And that's from a smaller pool of farms ever, you know, present before. Excuse me. As I said in my reply brief, the chaos that is the dairy industry has spread from rural America, Main Street, rural America, to Wall Street, New York City. The takeover of Dean, the attempted takeover of Dean by DFA was a foreseeable result of the action of pushing through the settlement that we objected to. The class representatives continue to advance the claims on behalf of the class members, the other class members. I have filed in the district court a number of times. I filed on a different retaliation claim. I made counsel aware of the fact that in the Swantac case, they opted out of the original case, and they took the case back with attorneys that we jointly found to the district court. They're on schedule for trial representing 70. They've gotten through summary judgment with a damage model of $0.78 per hundred pounds of milk. And the settlement settled for $0.02 per hundred weight. So basically what I'm here to say is class action system is set up to provide a benefit to society. There were 90 million shares, or there are 90 million common shares of Dean's stock. They were worth between $20 and $30 apiece. Today they're worth between $0.05 to $0.08. If I can quote from a motion for Dean's shareholders, it says, in sum, DFA and Dean have crafted the current situation for years. To allow DFA as top creditor and Dean's management to profit from this situation by controlling its resolution would not only be contrary to fundamental principles of bankruptcy law, it would provide judicial sanction to an economic crime of national proportions. The failures of earlier courts and class action firms have left this court, referring to the Texas court, facing the profound antitrust problem at the heart of this bankruptcy case. So I'm saying that this money that still exists in escrow or wherever, that it should be distributed to the people who are actually working for the benefit of the class. I don't recall if I mentioned that in the instant case, the settlement fund was created out of our milk checks. So it's, you know, it's even more applicable. And I would quote Thurgood Marshall also, who said, do what's right and let the law catch up. I don't know if Judge Poole recalls. She actually had a conversation with my son Joshua at SU, Syracuse University, on this case. Mr. Lynch obviously has heard of this case before. Your Honor, excuse me. Judge Lynch. Yeah, so basically I contrast their activities. I contacted my ombudsperson, something Mr. Smith talked about quite a bit. She said, very interesting. Wow, it really looks like you were singled out. And never got back to me. Because of attorneys, as a result of the way the settlement was set up, the ombudsperson has no authority to do anything. She can simply recommend or whatever. And the defendants have not followed the settlement protocol in the SITS case, in addition to the much improved damage award. There was, in summary judgment, a bunch of things that the district court pointed out, where DFA failed to abide by the settlement terms. I shared these with counsel, and once again, nothing happened. Did the settlement ultimately go to the dairy farmers? The settlement, well, yes, of course. But it was paid for by the dairy farmers. I mean, I have that in our appeal and in the final fairness hearing. We tried to submit items, and in this case, some of them which are no longer relevant, because these farmers are out of business, so they can't be hurt by the cartel. But I have an example where Mr. Ferner, who was a dairy farmer, explained that he saw these assessments on his milk check as we were, quote, negotiating settlement and recognized that DFA was already taking their pound of flesh. So, yes, the settlement was dispersed among the farmers, but my argument would be that there was $7 million left out that the attorneys ended up with for basically selling us out. My little closing is the court has the authority necessary and a unique opportunity to send a clear message to lawyers who line their pockets using the class action system to make vassals of their clients. Justice Marshall did not get a seat on the Supreme Court or his name on this courthouse by playing inside the box that the attorneys have crafted. If the monies are to be equitably distributed, there's law and equity, they belong with our side. Even Alice Allen argued at the Vermont Statehouse and the Statehouse, which incidentally Mr. Smith was encouraged to get involved by that same Statehouse. I wonder if they would have encouraged him had they known that by covering for the cartel, covering for DFA with this settlement, it would have cost them their flagship co-op. St. Albans has since been taken over by DFA as well. And so Alice Allen, who actually opposed us with supporting the settlement, at the end of the day has now continued to lobby against the monopoly and the cartel. And so basically you have an antitrust case that was ---- Mr. Horwitz, you understand that the settlement has already been approved. I understand that. And you understand the attorney's fee award has already been approved. I understand that. And what this is about is whether Mr. Smith should get more of the loot than the other lawyers. Correct. And are you telling us that he should not get ---- are you telling us he should get less? I am saying, and this is where I'm saying, this is an equitable solution. And I don't ---- precedents start somewhere. I am saying that class representatives have kept the antitrust claim alive. We've been corresponding with the Department of Justice. We've been pushing this ball forward. Yes, but I'm asking you, what are you asking for? We provide a benefit to the class. I'm asking you to give us four original class representative farms, the remaining 500, I don't know the exact number of money, but to divide it among the original. Four class representative farms sits in Swantec, as I say, have kept the antitrust claim alive in the ---- How much money is this? Is this money that hasn't been distributed? This is the money that hasn't been distributed, that Mr. Smith is looking for a bigger piece of. All right, thank you. We'll hear from the appellees. Good afternoon. May it please the Court, I'm Dan Foy for the appellee and a lead counsel. And you're representing? The appellee and a lead counsel for the non-DFAD subclass. The lead counsel. Yes, Your Honor. And with me is Brent Johnson, who is a lead counsel for the other subclass, and I'd like to reserve or allocate two minutes of my time to him. Two minutes, yes. Thank you. This Court's determination of whether a fee allocation is reasonable depends on the circumstances of the entire case, and Judge Lynch had it right. Intervenor counsel's argument begins at the last 90 days of a case that has now lasted a decade. This case was filed in 2009 on a contingency with plaintiffs' firms bearing all of the risk. Intervenor counsel shared none of that risk. The case was then litigated for five years, hard, all the way to the eve of trial. Intervenor counsel was not part of that litigation. Lead counsel reached a settlement agreement, a signed agreement, with the DFA defendants for $50 million in non-monetary terms. That was accomplished on the eve of the trial scheduled for July 2014. Intervenor counsel had no role in that settlement. Only after the $50 million settlement was signed, intervenor counsel tried to intervene. And even then, the district court permitted intervenor counsel to intervene in 2015 on the condition that they share, quote, the same responsibilities and obligations as existing subclass counsel. That's the Joint Appendix 137. That was a condition insisted upon by lead counsel to avoid an unequal windfall of fees for late-arriving counsel. It was in this context that the district court considered the various counsels' contributions, and there were seven different law firms. Was that appointed because the deal just didn't go through? Wasn't there a holdup at the end? Is that why they were appointed? There was, Your Honor. After the $50 million settlement was signed, the district court did not grant it final approval because of some concerns with the process by which the settlement was negotiated and because of objections being raised by subclass representatives who did not want to settle, including the Haars, who are here today. After those objections were raised, the district court... Essentially, those objectors included pretty much all of your named plaintiffs. There were three of the four. There were four named plaintiffs at the time. Three of them raised concerns with the settlement. Thereafter, the court allowed Mr. Smith and Mr. Cassidy to intervene, and the court also appointed six additional class representatives. And it was the combination of the intervener counsel plus the additional six class representatives who all together participated in negotiating. And who represented the six newly named plaintiffs? Four of them were members of Mr. Johnson's class, and two of them were represented by Mr. Smith. Okay. What about the issue that Mr. Smith raised about the explanation that the district court provided? So they asked for compensation for about over 800 hours of effort, and the district court says, I'm going to award compensation for 366 hours at $300 per hour. Do we know how that number came about? How does she calculate 366 hours? So the court's opinion identifies the issue the court had with reviewing Mr. Smith's records because he didn't submit any billing records. And so the court was not able to give a precise explanation for how the hours were reduced. Even if it's an imprecise explanation, where does the number 366 is a precise number, so do you have an idea about where it came from? I could speculate. It's about the approximate haircut that all the other counsel took. Oh, it's just a standard percentage reduction across the board. Well, the court awarded fees that were enough to pay about 40% of the load star of the collective group of lawyers. At the time of the court's fee award of $7 million, the load star for the collective group of plaintiff's lawyers was about $28 million. So everybody was going to get paid less than what they claimed to be owed, and I think the court— But isn't that explanation kind of at odds with her rationale, which is that those attorneys were claiming compensation for stuff that was not properly compensable, and so there should be other reasons for reducing the award than just a standard reduction, right? You're referring to the hours of intervener counsel? Right, of intervener counsel. Yes. Right, that they were claiming for efforts before they became counsel and other things. Yes. And so shouldn't that be the explanation? So if it's just a standard reduction, then it means that that explanation is not really applying to the ultimate award? So the explanation that you just referred to is in the court's opinion. There were about $65,000 of time that was claimed by intervener counsel that predated their appointment as a class counsel, and the court did say that they had cited no cases that allowed them to be compensated for that amount of time. So that would account for $65,000 of the reduction the court applied. There's a little additional reduction that the court applied, and I think the court explained that was because she was not able to identify and confirm all of the hours that were billed because there had been no billing records submitted. So the fee was not based on a load star. It works out to be about 40 percent, but the original fee was a contingency-type award, right? It's a percentage of the total award. That's true, Your Honor. The original award of $7 million from the $50 million settlement, the court expressed in terms of percentage. It was 14 percent. Right, 14 percent. Which you do the math and it results in about 38, 39 percent of the full load star that had been requested. The fees allocated to intervener counsel are not unreasonably and are not reversibly small, considering the district. What the district court did was to knock out certain amounts and then come up with a number that wound up not penalizing them more. In a certain sense, they may have gotten more. If you exclude the hours that the district court excluded, they got more than 40 percent of the allowable hours. Now, I don't know to what extent, and go back and look at to what extent the district court took a whack at your numbers before coming up with the 14 percent in the first place. But this is a very imprecise science. We were talking about sentencing before, where people's lives are on the line. That's also an imprecise science. But awarding fees to class action lawyers to give them an incentive to continue to bring involves a lot of very rough justice. Indeed, some district judges have been known to say, if you want this salami to be aired in the Court of Appeals and how it got made, you're welcome, but why don't I lock you in a room and make you work this out between the two of you? Because the last thing we want to be doing is adjudicating the precise contributions of dozens of law firms to the ultimate outcome, which a lot of the people who you were representing think was not a very good outcome in the first place. And then we get these folks coming back in saying, you know, maybe nobody should get anything. And that's what happens when lawyers can't figure this stuff out among themselves and start to get just a little greedy about who's going to get what out of this amount. I'm just saying, you know, this is not the kind of litigation that typically reaches the Court of Appeals where lawyers are squabbling over the pot. Judge Rice is pretty cheap, I would say, in giving a 14 percent award, but it was, I thought, a pretty reasonable one under the circumstances. It's not a huge amount of money that the plaintiffs are actually coming up with out of this. She made that choice. And now, you know, you guys are squabbling over the spoils when these folks are the ones who were ultimately hurt. It's not a good look, to say the least, to not be able to come here and say, you know, we've resolved this. Because the only fight is about, you know, which lawyers made which contributions. I'm not in a very good position to assess that compared to what the judge on the scene was able to do. Your Honor, may I respond? Yes. Respond, yes. Thank you. I agree with all of your points. And we, all of the law firms except for Intervenor Counsel, had reached an agreement to have an equal distribution of the money. So we made that effort. Intervenor Counsel did not agree. The award that, the allocation to Intervenor Counsel by Judge Rice has given Intervenor Counsel more, a larger cut, a percentage cut based on Lodestar than all the other counsel who litigated the case for nearly a decade. And we think that, and we submit that there was no abuse of discretion by the court in doing that. And that the court's allocation award should be affirmed. I think all of Mr. Smith's arguments today we've addressed in the briefing. And unless you have questions about that, I would pass the podium to my co-counsel. Thank you, counsel. Yes. Thank you. May it please the court, I'm Brent Johnson of Cohen Milstein on behalf of the appellees and also the DFA DMS subclass. I'm going to be mercifully brief. I am only going to address what the Haars have written in their papers. And I'm not going to address the substance of the fee appeal. The court can stop me at any time it likes. The Haars make a number of false allegations about counsel's conduct in their papers. They're obviously not germane to the issue that's on appeal. Many of them are the same allegations that were made when the Haars moved to remove subclass counsel five years ago. The district court held a two-day evidentiary hearing about that motion before denying it. The court found that it had no reason to doubt the representation that subclass counsel were, quote, acting in the best interests of the class consistent with their fiduciary duties. That's at JA-111. The court also found that numerous concerns regarding subclass counsel's performance, quote, arise out of strategic and tactical decisions which subclass counsel are entitled to make on behalf, on the class's behalf and do not constitute actual misconduct. The district court denied the Haars motion. When the Haars appealed the district court's approval of the settlement in this case, this court, as Judge Lynch may remember, affirmed the district court's judgment. That's at 687 Fed Appendix 93. This court also noted that the district, quote, the district court conducted a lengthy hearing into the objector's challenge to their attorney's conduct of negotiations and found there was no evidence of impropriety. That's at 95. It then found, quote, upon a full review of the record, we find no reason to disturb the district court's findings. This court also found that despite the Haars concerns and dissatisfaction, quote, the settlement was approved after careful consideration by a judge who had presided over the litigation with energy, skill, and zeal to assure that the interests of the members of the plaintiff's classes were protected. It should similarly affirm the court's thoughtful finding on fees here. Thank you.   Mr. Smith, you have two minutes. Thank you, Your Honor. I have to take your point, Your Honor. The problem was twofold in the court's decision. The court announced a post-settlement fee award from interest earned on the settlement that had been paid out. The settlement's not only been reached, been paid out. The attorney's fee to lead counsel's been paid out. The only thing that was left was $500,000 in escrow that was kept to, in case we could not resolve the matter. I thought that mistake was corrected. So part of the reason we brought the appeal was to ensure that that mistake got corrected. But the underlying problem is still there. And I think, you know, the questions have really raised the issue, which is it's a very imprecise fee decision. And on the key part, which is our contributions, you can't tell why the court made its decision. And we are admittedly taking the risk that if you remand it, we might end up with less. But the application of the Goldberger factors, there's no analysis of that and there's no analysis of the Lodestar. So the calculation of how the numbers were actually reached, you can't tell. And it's very difficult to make it up. Do you agree that it's roughly the same haircut that lead counsel got? I'm not trying to avoid the question. I honestly can't tell. Because the number of hours, and I absolutely take the point, the last thing you want to do is to get into the math. I absolutely take the point. However, what's in the opinion is 867 hours, which was our time pre-settlement. If you include the time post-settlement, it's over 1,100 hours. We put that in for a Lodestar cross-check. At 366 hours, against which did she measure? I can't tell. Because the ---- What happens to the balance of the 500,000 if we affirm the district court, which would give you less, substantially less than 500,000? Yes, Your Honor. The ---- Where does that go? Our amount is deducted from the 500,000 and the remainder goes to the district court. The 500,000, as I read the papers, where does the other 400 ---- To lead counsel. Right. Where does the balance of the money go? There's $500,000 in escrow, and so if we are to receive 110,000, the remaining 390,000 goes to lead counsel. Because it's part of the $7 million, and you're asking for a piece of the $7 million, and the district court set aside a big chunk of that, or a chunk, a $500,000 chunk of the $7 million against this decision of how much you should get. Correct. That's correct. And the original decision ---- And you didn't even ask for $500,000. You asked for 280 or ---- 250,000 round numbers. 250,000 round numbers. That's correct. So 250 of it would go to them anyway. And the important thing, which is mostly important to you, is a smaller percentage of their $7 million minus something than it is of yours is the spread between the 110 and the 250. Yes. That's what we're fighting for. And, you know, again, I completely take your point. Not a good look, tough use of your time. But I'm a sole practitioner. The body of that time, which the Court speaks to, 867 hours, and then references as if it's post-settlement when it's not, that was the body of my time spent on this case. And the net result of what we did was to achieve a settlement. And all we're looking for is to get our time. And I take the point that they took a big haircut, but it isn't that we're trying to get rich, just to be clear. I understand the look, but really not trying to get rich. Just try to get paid hours for having advanced the case to a settlement. I understand. I thank you for your time. Thank you, Counsel. Reserved decision. Thank you all for appearing and arguing to us. That's the last case on our calendar, so I will ask the Clerk to adjourn court. Court is adjourned. �